# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| BRYAN ROSEMAN, | : | Case No. 1:17-cv-826 |
| Plaintiff, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| LINMORE INVESTMENTS, INC., | : | |
| | : | |
| Defendant. | : | |

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### (Doc. 15)

This civil case is before the Court on Defendant Linmore Investment Inc.'s motion for summary judgment (Doc. 15), and the parties' responsive memoranda (Docs. 16, 17).

### I. BACKGROUND[1]

Plaintiff Bryan Roseman first secured his Class A Commercial Driver's License ("CDL") in 2009. (Doc. 15-8 at ¶ 1). He also had a Hazmat endorsement. (*Id*. ¶ 1). To maintain his CDL, Roseman was required under Department of Transportation ("DOT") regulations to submit to a yearly physical and meet minimum vision standards, ensuring that he maintained the necessary eyesight capability to safely operate a tractor trailer. (*Id*. at ¶¶ 1, 15).

Defendant Linmore Investments, Inc. ("LMI") is a transportation company specializing in hauling liquid bulk hazardous chemicals. (*Id*. at ¶ 15). In December

---

[1] Pursuant to the Court's Standing Order, each party filed a Statement of Proposed Undisputed Facts, as well as a Response to Proposed Statement of Undisputed Facts and a Statement of Disputed Issues of Material Fact. (Docs. 15-8, 16-1). The Court's statement of facts set forth in this Order incorporates the material facts undisputed by the parties.

2010, Roseman began working as a tanker truck driver/employee for LMI. (*Id*. at ¶¶ 2, 15). His place of employment with LMI was Terminal 870, located initially at Evendale Drive and later Crescentville Road in Cincinnati. (*Id*. at ¶ 2). Terminal 870 employs about 30 employees. (*Id*. at ¶ 23).

Roseman admits he had knowledge of the following: (1) driving for LMI required passing a physical exam, (*id*. at ¶ 2); (2) per LMI's employee handbook, he would require a medical release from a physician before returning to work after leave, (*id*. at ¶ 3); (3) any return to work was contingent on passing a medical exam, (*id*.); and (4) he would need to inform Operations Manager Robert "Bobby" Moore when he was medically released to return as a driver after taking leave, (*id*.).

There is no dispute that Roseman understood LMI's leave of absence policy, having had prior medical issues and medical leave. (*Id*. at ¶ 6). For example, in January 2014, Roseman supplied LMI with notice of diabetes issues and treatment, and ultimately returned to work as a truck driver. (*Id*. at ¶ 6).

Roseman admits that it is against DOT Regulations for a Class A CDL to drive a vehicle with 20/400 vision; instead, the requirement is 20/40. (*Id*. at ¶ 6). On April 3, 2015, Roseman notified LMI and Moore that he was having vision problems in his right eye. (*Id*. at ¶¶ 7, 16). Medical records indicate that Roseman began seeking treatment for his vision problems as early as March 18, 2015. (*Id*. at ¶ 7). Roseman's physician told him he could not operate a tractor trailer because the vision in his right eye was 20/400. (*Id*. at ¶¶ 7, 16). Because Roseman's next doctor visit was May 1, 2015, Moore placed Roseman "out of service" and on voluntary medical leave of absence until he

could provide a doctor's release. (*Id*. at ¶¶ 7, 16). Moore told Roseman that LMI could not have him drive a truck until he was released by a doctor, and to keep the company informed on when he could return. (*Id*. at ¶¶ 7–8). Roseman was granted medical leave time until June 2015. (*Id*. at ¶ 17).

Over the next few months, Roseman and LMI had various communications. On June 3, 2015, LMI's office manager, Shannon Schroeder, emailed Roseman about paying his insurance premiums while he was on unpaid leave. (*Id*. at ¶ 9). Roseman replied on June 16, indicating he would come in soon. (*Id*. at ¶ 9).

On June 4, 2015, LMI's then-President, Jody Lindsey, emailed Roseman, indicating his voluntary leave would expire on June 12, and the company needed an update on his vision status from his doctor. (*Id*. at ¶ 10). Roseman contends that he did not receive the June 4 email until after his termination. (*Id*.) However, Roseman admits that around June 17, 2015, when Roseman paid part of his insurance premium, Lindsey and Schroeder told him he was "coming up on 12 weeks." (*Id*.).

Schroeder then filled out Roseman's termination paperwork, with an effective date of June 19, 2015. (*Id*. at ¶ 25). The paperwork indicated he was eligible for rehire. (*Id*.) Roseman states that he learned of his termination from a COBRA notice. (*Id*. at ¶ 10).

Through July 2015, Roseman supplied LMI with doctor's notes. (*Id*. at ¶ 11). As of July 1, 2015, Roseman was still unable to return to work as a driver. (*Id*.) When Roseman supplied his July doctor's note to Schroeder, he told her he could not return to work even through early August, and "didn't seem like [he] was getting back anytime soon." (*Id*. at ¶ 11).

On July 9, 2015, Schroeder emailed Roseman, based on Lindsey's instructions, attaching all portions of LMI's employee handbook related to any kind of leave. (*Id.* at ¶ 26). This handbook was already in Roseman's possession, since the start of his employment. (*Id.* at ¶ 3). Portions of the handbook included a description of FMLA leave, and also described eligibility requirements for FMLA to apply, including that the employee must be a covered employee, *i.e.,* work at a location where the employer, within 75 miles, employs at least 50 employees. (*Id.* at ¶ 26). The handbook also described LMI's voluntary leave provisions, including 12 weeks discretionary leave, the required medical release, and that the employees are subject to termination if they do not return at the end of leave. (*Id.*)

Roseman's next communication with LMI about his vision issues was with Moore in December 2015. (*Id.* at ¶ 13). At that time, Roseman informed Moore he was cleared to return as a driver. (*Id.*) Moore told Roseman that the company had no available trucks at that time. (*Id.*) Roseman found new employment as a driver in January 2016. (*Id.*)

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must

4

be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

### III. ANALYSIS

Roseman asserts eight claims against LMI: (1) failure to accommodate in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.*; (2) failure to accommodate under Ohio Rev. Code § 4112.02(A); (3) disability discrimination under the ADA; (4) disability discrimination under Ohio law; (5) Family Medical Leave Act, 29 U.S.C. § 2615, interference; (6) FMLA retaliation; (7) Employee Retirement Income Security Act interference, 29 U.S.C. 1001, *et seq.*; and (8) ERISA retaliation. LMI moves for summary judgment on all claims.

#### A. Counts I and II –Failure to Accommodate

Counts I and II are Roseman's failure to accommodate claims under state and federal law. Both parties acknowledge that disability claims under state and federal law are analyzed on the same basis. (Doc. 15 at 15; Doc. 16 at 4). *Johnson v. JPMorgan Chase & Co.*, 922 F. Supp. 2d 658, 666 n.6 (S.D. Ohio 2013); *Esparza v. Pierre Foods*, 923 F. Supp.2d 1099, 1104 (S.D. Ohio 2013). Thus, it is appropriate for the Court to analyze these claims together.

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The Act's broad definition of discrimination includes

"not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id*. § 12112(b)(5)(A); *see also Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 415–16 (6th Cir. 2020); *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007).

"Because the record reflects that [Roseman]'s claim was based on [LMI]'s failure to offer a reasonable accommodation, it involves direct evidence of discrimination under the ADA." *Fisher*, 951 F.3d 409, 417 (6th Cir. 2020). Under the direct-evidence framework, Roseman bears the burden of establishing (1) that he is disabled, and (2) that he is "'otherwise qualified' for the position despite his [] disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kleiber*, 485 F.3d at 869 (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)). LMI then bears the burden of "proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon" LMI. *Id*. (citation omitted). "[A]lthough a defendant may use a legitimate, nondiscriminatory rationale as a shield against indirect or circumstantial evidence of discrimination, such a neutral policy is of no moment under the direct test." *Fisher*, 951 F.3d at 417 (quotation omitted). "In other words, an employer may not illegitimately deny an employee a reasonable accommodation pursuant to a general policy and use that same policy as a so-called neutral basis for firing him." *Id*.

6

### 1. Otherwise Qualified

LMI does not dispute that Roseman is disabled.[2] LMI instead argues that Roseman is not an otherwise qualified disabled individual because "[h]is vision issues precluded him from operating a tractor trailer under Federal law." (Doc. 15 at 13). Roseman does not demonstrate that he is "otherwise qualified" for the position; instead, Roseman argues that LMI failed to provide him accommodations while he was "temporarily disqualified" from driving. (Doc. 16 at 9).

In order to be "otherwise qualified" for a job, the individual must satisfy the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position. *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m). "Whether an individual meets the definition of a qualified individual with a disability is to be determined at the time the employment decision was made." *Cummings v. Dean Transp., Inc.*, 9 F. Supp. 3d 795, 801–02 (E.D. Mich. 2014) (citations omitted). An individual who cannot perform the essential functions of a job is not qualified, and in such cases, the ADA does not come into play. *Dietelbach v. Ohio Edison Co.*, 1 Fed. App'x. 435, 436–37 (6th Cir. 2001).

"Essential functions" are "the fundamental job duties of the employment position," but do "not include the marginal functions of the position." 29 C.F.R.

---

[2] The ADA defines disability to mean either (1) "a physical or mental impairment that substantially limits one or more of the major life activities;" (2) "a record of such impairment'" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102. The parties do not discuss whether Roseman's level of vision impairment qualifies as a disability under the ADA.

7

§ 1630.2(n)(1). "[C]ompliance with DOT safety regulations is an essential function of the job for a commercial driver." *Cummings*, 9 F. Supp. 3d at 802 (citing *King v. Mrs. Grissoms Salads, Inc.*, 1999 WL 552512 (6th Cir. 1999)) (collecting cases finding drivers not otherwise qualified when medically precluded from operating commercial vehicles). "Where a plaintiff seeking a commercial driving position cannot obtain the required DOT certifications he is not an 'otherwise qualified' individual for purposes of the ADA." *Id.* at 803 (citations omitted).

Roseman does not dispute that being able to obtain, and maintain, the appropriate license is an essential function of a commercial driving position. Roseman also does not dispute that a person who cannot perform essential functions of a job is not a qualified individual for purposes of the ADA. Roseman does not dispute that, at the time he was released from LMI, his vision precluded him from driving a commercial tractor trailer. Thus, based on the undisputed facts, Roseman was not able to complete an essential function of the position, and his failure to accommodate claims must fail.

However, the Court deems it necessary to discuss Roseman's proposed accommodations, because although he could not perform the essential functions of his position, he argues in support of two accommodations, both legally recognized, that would not have him driving. Roseman argues that LMI should have: (1) reassigned him to light duty work; and/or (2) provided him with additional unpaid leave. (Doc. 16).

    2.    **Proposed Accommodations**

Under the ADA, a "reasonable accommodation" <u>may</u> include "reassignment to a **vacant** position." 42 U.S.C. § 12111(9)(B) (emphasis added). Consequently, "an

8

employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified." *Burns v. Coca–Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000). However, this duty does not require employers "to create new jobs [or] displace existing employees from their positions…in order to accommodate a disabled individual." *Id.*; *see also Kleiber*, 485 F.3d 869.

Providing additional leave may also be a reasonable accommodation. However, "[a]n employer is not required to keep an employee's job open indefinitely." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017). The Sixth Circuit "has held that additional leave is an objectively unreasonable accommodation where an employee has already received significant amounts of leave and has demonstrated 'no clear prospects for recovery.'" *Id.* (quoting *Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000)).

Roseman's arguments for proposed accommodations fail for three reasons: (1) he never requested reassignment to a new position or additional leave; (2) *even if* Roseman had requested reassignment, there were no vacant positions that he could fill with his qualifications; and (3) *even if* Roseman had requested additional leave, LMI was not required to grant him indefinite leave.

"An employee must affirmatively request an accommodation because many disabled people do not need an accommodation, and the employee is in the best position to know how the disability impacts their work." *Cady v. Remington Arms Co.*, 665 F. App'x 413, 418 (6th Cir. 2016). "[O]nce an employee notifies the employer of any

9

limitations and requests an accommodation, the employer must discuss the limitations and potential accommodations with the employee." *Id*. (citing *Kleiber*, 485 F.3d at 871; 29 C.F.R. § 1630.2(o)(3)). Both parties must participate in good faith in this interactive process to explore possible accommodations. *Kleiber*, 485 F.3d at 871.

Here, LMI certainly knew of Roseman's limitations, given Roseman was told he could not drive with his vision issues. However, according to Roseman's own deposition testimony, Roseman did not request *any* accommodation until <u>after</u> he was already terminated from LMI:

> Q: Do you have any recollection of any other conversation with anybody else at LMI other than the call to Bobby [in December 2015 telling him you could drive again]?
>
> A: Oh, I went in before when I was off, after I found out that I was terminated, and asked them about did they have anything for me to do like dispatching or any cleanup work around there, and the answer was no.
>
> Q: Who did you talk to?
>
> A: Bobby
>
> Q: And when did that happen?
>
> A: In between the termination and December….
>
> Q: And did you talk to anybody else when you went in that day other than Bobby, Jr.?
>
> A: I spoke with Tracy…I was just asking did they have anything because I knew the girl – they were down a dispatcher, so I asked about dispatching, and then I asked did they have any other type of work I could do, and they didn't have any light duty work or anything for me.

10

(Doc. 14, Roseman Dep. at 176–77).³ Thus, because Roseman did not request his proposed accommodations, or even attempt to discuss any accommodations until after his termination, these claims must fail.

*Assuming arguendo* that Roseman had requested accommodations, LMI was under no obligation to provide his suggested accommodations. The undisputed record, including Roseman's own testimony, indicates that LMI had no "light duty" work available for Roseman. (*Id*.) And, LMI was under no obligation to create such a position for him. *Hoskins v. Oakland Cnty. Sheriff's Dept.*, 227 F.3d 719, 729–31 (6th Cir.2000) ("It is well established ... that an employer is not obligated to create a position not then in existence.").⁴

LMI was also not required to provide Roseman with additional unpaid leave because the undisputed record shows that there was no realistic expectation of when Roseman could return. Roseman was put on leave in April 2015, and as late as August 2015, he was still unsure when he could return. (Doc. 15-8 at ¶ 11). Roseman was not cleared to drive again until December 2015. (Doc. 15-8 at ¶ 13). Given the unknown length of Roseman's vision issues and inability to drive, LMI was not required to leave Roseman's position open indefinitely. *Williams*, 847 F.3d at 394.

---

³ Roseman tries to argue that the timing of his request is a dispute of fact, citing his own deposition testimony. (Doc. 16-1 at ¶ 12 (citing Doc. 14, Roseman Dep. at 177)). However, this testimony clearly indicates he requested accommodations after his termination.

⁴ Roseman's argument that LMI provided light duty work as an accommodation to other employees in the past is unpersuasive. Although light duty work may have been available in the past, the record does not suggest that light duty work was available when Roseman presented with vision issues.

Based upon the foregoing, LMI's motion for summary judgment on Counts I and II is **GRANTED**.

**B.  Counts III and IV – Disability Discrimination**

Counts III and IV claim disability discrimination based on LMI treating Roseman less favorably than non-disabled employees and terminating his employment. LMI argues that it should be granted summary judgment on these claims because Roseman failed to respond to its arguments related to these claims. Thus, Roseman has abandoned these claims. *See, e.g., Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment).

Roseman does not discuss Counts III and IV in any meaningful detail in his response in opposition, merely mentioning these claims in the opening of his legal analysis section. (Doc. 16 at 4). Roseman then proceeds to only discuss his failure to accommodate claims. He does not discuss or mentioned how non-disabled employees were treated more favorably then him or LMI's termination of his employment as related to any disability. Thus, the Court finds that Roseman has abandoned these claims.

Even assuming Roseman has not waived these claims, Roseman's disability discrimination claims fail for the same reasons as his failure to accommodate claims. For example, to establish a *prima facie* case of disability discrimination for discharge, a "plaintiff must prove that: (1) she has a disability; (2) adverse action was taken by [the employer], at least in part, because of her disability; and (3) even though she had a disability, she could have safely and substantially performed the essential functions of the

12

job in question with or without reasonable accommodation." *Bare v. Fed. Exp. Corp.*, 886 F. Supp. 2d 600, 609 (N.D. Ohio 2012) (applying Ohio law).

As discussed, Roseman could not safely perform the essential functions of the tractor-trailer driver position due to his vision issues. Roseman did not request any reasonable accommodation until after his termination, nor could LMI provide him with any of his post-termination requests for accommodation. Roseman did not demonstrate the elements, nor discuss a genuine dispute of fact related to the elements, of his disability discrimination claims.

Accordingly, LMI's motion for summary judgment on Counts III and IV is **GRANTED**.

    C.    **Counts V and VI – FMLA Interference and Retaliation**

"The FMLA entitles an eligible employee to as many as twelve weeks of leave during any twelve-month period if the employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 243 (6th Cir. 2004) (quoting 29 U.S.C. § 2612(a)(1)(D)). An employee seeking to use his FMLA leave must notify the employer that FMLA-qualifying leave is needed. *Id*. at 243–44 (citations omitted). The Sixth Circuit recognizes two distinct theories for recovery under the FMLA: "(1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Id*. at 244.

Here, Roseman brings both an interference and retaliation claim under the FMLA. To succeed on both claims, Roseman must demonstrate that he is an "eligible employee"

13

for purposes of the FMLA. *Humenny v. Genex Corp.*, 390 F.3d 901, 905 (6th Cir. 2004) ("the FMLA's 'eligible employee' requirement applies in all FMLA cases"). LMI argues that Roseman is not an eligible employee, thus, his FMLA claims fail as a matter of law.

The FMLA excludes from coverage "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." 29 U.S.C. § 2611(2)(B)(ii). According to LMI, it does not employ 50 or more employees within a 75-mile radius of the terminal at which Roseman was stationed, thus, Roseman was not an eligible employee for purposes of the FMLA. In response, Roseman argues that LMI is a "co-employer" with Quality Carrier, which company has a terminal within 75 miles of Roseman's LMI terminal, and between the two terminals there are more than 50 employees.

Roseman does not provide any legal analysis concerning whether LMI and Quality Carrier are "co-employers;" however, "[i]n certain situations, two entities will be viewed as a single employer of an employee provided they meet either the 'joint employment' test discussed in 29 C.F.R. § 825.106, or the 'integrated employer' test discussed in 29 C.F.R. § 825.104(c)(2)." *Russell v. Bronson Heating & Cooling*, 345 F. Supp. 2d 761, 771 (E.D. Mich. 2004). These tests are tools that help ensure the "appropriate employees are aggregated for the numerosity test of the FMLA." *Grace v. USCAR*, 521 F.3d 655, 664 (6th Cir. 2008). "[T]he test[s] appreciate[] that small businesses—*i.e.*, those with less than 50 employees—are not subject to the FMLA's onerous requirement of keeping

14

an unproductive employee on the payroll, while simultaneously preventing companies from structuring their business to avoid labor laws." *Id*. (citation omitted).

### 1. Integrated Employer Test

Under the "integrated employer" test, "[s]eparate entities will be deemed to be parts of a single employer for purposes of the FMLA" and the "employees of all entities making up the integrated employer will be counted in determining employer coverage and employee eligibility." *Grace*, 521 F.3d at 664. The regulations provide four factors for determining whether two entities should be treated as an integrated employer: (1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership and financial control. 29 C.F.R. § 825.104(c)(2).

There is no evidence presented, by either party, that LMI and Quality Carriers have common management, centralized control of labor relations, or common ownership and financial control. At most, there is some evidence that LMI and Quality Carriers may use the same drivers, discussed *infra*, but there is no evidence that the two share administrative operations. Thus, the Court finds that LMI and Quality Carriers are not "integrated employers" for the purpose of the FMLA.

### 2. Joint Employer Test

Alternatively, "joint employment" encompasses situations where "two or more businesses exercise some control over the work or working conditions of the employee." 29 C.F.R. § 825.106(a). "In a joint employer relationship, the analysis assumes separate legal entities exist but that they have chosen to handle certain aspects of their employer-

15

employee relationships jointly." *Grace*, 521 F.3d at 665 (quotation omitted). "Unlike integrated employers, which are treated as a single legal entity, joint employers 'may be separate and distinct entities with separate owners, managers, and facilities.'" *Id*. (quoting 29 C.F.R. § 825.106(a).

> Joint employers are generally considered to exist:
>
> > (1) Where there is an arrangement between employers to share an employees' services or to interchange employees;
> >
> > (2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,
> >
> > (3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by or is under common control with the other employer.

29 C.F.R. § 825.106(a). A common example of joint employers could be a temporary agency and the employer to which the agency provides employees. *Id*. at § 825.106(b). Factors to consider for joint employment include: "'authority to hire, fire and discipline employees, promulgation of work rules and conditions of employment, issuance of work assignments and instructions, and supervision of employees' day-to-day activities.'" *Russell*, 345 F. Supp. 2d at 771 (quoting *EEOC v. Regency Windsor Mgmt. Co.*, 862 F.Supp. 189, 191 (W.D. Mich. 1994)).

To reiterate, Roseman does not argue whether LMI and Quality Carriers are integrated or joint employers, but contends that the following evidence shows that LMI and Quality Carriers are "co-employers." First, Roseman cites his own affidavit, which avers that: (i) he always understood LMI and Quality Carriers to be co-employers; (ii)

16

there are LMI and Quality Carrier terminals within 75 miles of each other; and, (iii) to his knowledge, the LMI terminal employed at least 30 employees and the Quality Carrier terminal employed at least 20 employees. (Doc. 16-2 at ¶¶ 6–8). Next, LMI employees' email addresses include the domain name: "@qualitydistribution.com." (Doc 12, Schroeder Dep., Ex. 1). Roseman points to the deposition testimony of Tracy Senay, a dispatcher for LMI, during which deposition Senay testified to the following:

> Q: It would appear that LMI and Quality Carriers share an address on Crescentville Road; is that correct?
>
> A: Yes.

(Doc. 13, Senay Dep. at 18:21–24). Senay also described one situation in which Quality Carriers disqualified an LMI employee. (*Id*. at 33–34). Roseman last argues that LMI uses Quality Carriers' application to hire drivers and minimum hiring requirements, pointing to his own Quality Carriers' application. (Doc. 14, Roseman Dep., Ex. 2). However, the Court notes that, when reviewing the record, Roseman filled out both a Quality Carrier and an LMI application. (*Id*.)

LMI submits the affidavit of Jody Lindsey, the owner, President, and CEO of LMI. (Doc. 15-1). Lindsey clarifies that LMI is an affiliate of Quality Carriers, but is not owned by Quality Carriers. (*Id*. at ¶ 26). This statement is verified by the LMI employee handbook, which does not include Quality Carriers and describes employment for "LMI/Care/BJ Transport, Inc. and LMI Logistics, Inc." (Doc. 14-1, Roseman Dep., Ex. 3). The introductory paragraph of the handbook provides that LMI "is an Affiliate Partner of Quality Carriers," LMI "came to be as a result of the sale of Lindsey Motor

17

Express to Quality Carriers," and that this was an opportunity for Lindsey and Moore to "Affiliate the terminal." (*Id*., Ex. 3 at 5). Lindsey also clarifies that Quality Carriers cannot hire or fire LMI employees, and *if* Quality Carriers disqualifies an LMI driver, that driver's LMI employment is not terminated. (Doc. 15-1 at ¶¶ 29–30). This statement is supported by the deposition testimony of Bobby Moore, LMI's co-owner. (Doc. 11, Moore Dep. at 6).

LMI also points to Senay's deposition testimony, which describes that LMI may attempt to refer work to Quality Carriers when LMI cannot complete the work, but Quality Carriers more often than not rejects it. (Doc 13, Senay Dep. at 20–21). Finally, LMI argues that there is no joint employer relationship between LMI and Quality Carriers based on Roseman's complaint and document production. Specifically, Quality Carriers is not a party to this action and is not referenced in the complaint, and Roseman only alleges he is an employee of LMI. (Doc. 1). Moreover, Roseman's W2s and paystubs only identify LMI as his employer. (Docs. 17-1, 17-2).

Based on the foregoing, which the Court construes in light most favorable to Roseman, LMI and Quality Carriers are not "joint employers." Although Roseman may have misunderstood LMI and Quality Carriers as "co-employers," the record shows that Quality Carriers did not have control over LMI employees, that the two employers did not act in the direct or indirect interest of one another, or that the two employers share services and employees. The record is devoid of any evidence of Quality Carriers supervising LMI employees, hiring or firing those employees, or issuing work directly to those employees. To be sure, the record reflects that LMI is an affiliate of Quality

18

Carriers and that the two may refer work to each other. However, a determination of a joint employment relationship must be viewed by the entire relationship "in its totality." 29 C.F.R. § 825.106(b)(1). And, the record shows that Roseman was under the supervision of LMI employees throughout his tenure, and it was ultimately LMI's decision to terminate his employment.[5]

Thus, considering the totality of the relationship and evidence presented, LMI and Quality Carriers are not joint employers, nor would any reasonable juror find as such.[6] And, the undisputed record shows that LMI does not employ more than 50 people within a 75-mile radius of Roseman's terminal. (Doc. 15-1 at ¶ 21). Accordingly, Roseman has not demonstrated that he is an "eligible employee" for purposes of the FMLA. LMI's motion for summary judgment on Counts V and VI is **GRANTED**.

---

[5] *See, e.g., Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004) (no joint employer relationship when, at most, entity verified that work complied with applicable regulations); *Adams v. Valega's Prof. Home Cleaning, Inc.*, No. 1:12CV0644, 2012 WL 5386028, at *14 (N.D. Ohio Nov. 2, 2012) (no joint employer relationship when no control over other employer's employees); *Phipps v. Accredo Health Grp., Inc.*, No. 215CV02101STACGC, 2016 WL 3448765, at *10 (W.D. Tenn. June 20, 2016) (granting summary judgment because "simply not enough evidence from which a reasonable juror could find" joint employers).

[6] The Court also notes that Roseman provides no evidence of the number of employees that work at the Quality Carriers terminal within the 75-mile radius of his assigned LMI terminal, other than his own affidavit claiming that to his knowledge, there are at least 20 employees at the terminal. (Doc. 15-2 at ¶¶ 6–8). Thus, even if Roseman's theory that LMI and Quality Carriers were joint employers prevailed, the theory still fails because Roseman has not demonstrated that the two entities, even if joint, would make him an eligible employee. *See Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 559 (6th Cir. 2009) (noting argument of "joint employers" curious on appeal when plaintiff provided no discovery that joint counting could lead to more than 50 employees).

### D. Counts VII and VIII – ERISA Interference and Retaliation

Roseman conceded that LMI is entitled to summary judgment on Counts VII and VIII. (Doc. 16 at 17). Accordingly, LMI's motion for summary judgment on Counts VII and VIII is **GRANTED**.

### IV. CONCLUSION

Based upon the foregoing, Defendant's motion for summary judgment (Doc. 15) is **GRANTED**. The Clerk shall enter judgment accordingly, whereupon this action is **TERMINATED** upon the docket of this Court.

**IT IS SO ORDERED.**

Date: 8/17/2021

s/Timothy S. Black
Timothy S. Black
United States District Judge